UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:10-CR-69-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **&** |
| | ) | **RECOMMENDATION** |
| ESTAEBAN NUNEZ-BETANCOURT | ) | |

This Cause comes before the Court upon Defendant's Motion to Suppress [DE-18], to which the Government responded [DE-23] and Defendant replied [DE-27]. The matter was referred to the undersigned on September 7, 2010, and an evidentiary hearing was held on October 1, 2010, in order to resolve factual discrepancies between the briefs filed by Defendant and the Government. [DE-36]. The matter is therefore ripe for adjudication. For the reasons stated herein, the undersigned recommends that Defendant's Motion to Suppress be denied.

**Factual Background**

The following statement of the facts is taken largely from the factual summary presented by Defendant in the memorandum of law supporting his motion, along with the exhibits attached thereto. Facts either disputed or not included by Defendant in his summary or the exhibits are noted as such and are based upon the evidence presented at the hearing on this matter.

In early February of 2010, Special Agent Thomas Swivel (SA Swivel) of Immigration and Customs Enforcement (ICE) interviewed a cooperating federal defendant in Horry County, South Carolina, regarding possible drug activity at a trailer located at 519 Old Baggett Road in Nakina, Columbus County, North Carolina. [DE-18, Ex. 7]. The informant stated that the trailer

"was used not only as [a] prostitution house for Hispanic drug dealers but also as a stash house and distribution point of large amounts of cocaine." [*Id.*]. The Columbus County Sheriff's Office began conducting surveillance of the trailer shortly thereafter. [*Id.*].

At approximately 3:00 p.m. on the afternoon of March 1, 2010, Detective Kevin Norris, Detective Justin Worley, and Lieutenant Steven Worthington of the Columbus County Sheriff's Office drove to the trailer to conduct surveillance and observed two vehicles, a Jeep Cherokee and a Nissan Sentra, parked in the driveway. [DE-18, Ex. 2; DE-35, p.4]. Because this was the first time the officers had seen any vehicles or other activity at the trailer, despite having conducted surveillance on ten to twenty previous occasions, they decided to investigate. [*Id.*]. Detectives Worley and Norris approached the trailer and knocked on the front door, while Lieutenant Worthington remained by the service vehicle. [Motion to Suppress Hearing Transcript pp. 9-10] [hereinafter T.pp]. Defendant answered the door. [T. p. 15]. He informed the officers that he resided at the trailer and provided a Mexican voter registration card as identification. [DE-18, Ex. 2]. Detective Worley explained that they had reason to believe narcotics were being stored at the residence and requested permission to search the premises. [DE-18, Ex.1]. Defendant replied that there was "nothing illegal" inside the trailer and denied consent to search. [*Id.*]. Detective Worley asked Defendant whether anyone else was present in the residence. [DE-18, Ex. 1]. Defendant said that his friend Norberto Nunez-Aguirre was inside, at which point Nunez-Aguirre also came to the door. [DE-18, Ex. 2]. Like Defendant, Nunez-Aguirre provided a Mexican voter registration card as identification. [*Id.*]. Both men denied possessing a valid drivers' license. [DE-18, Ex. 1]. According to the testimony at the hearing, Detective Worley then inquired about Defendant's immigration status. Defendant stated he was in the United States illegally. [T. p. 17]. After writing down the information provided to

them by Defendant and Nunez-Aguirre, as well as the vehicle tag information for the Jeep Cherokee and Nissan Sentra, the officers left the residence and continued their surveillance from a nearby concealed location. [DE-18, Ex. 1].

At approximately 3:30 p.m., the officers observed the Jeep Cherokee leaving the residence with two male occupants. [DE-18, Ex. 1]. As they knew that neither man at the residence had a valid drivers' license, the officers stopped the vehicle. They confirmed that neither Nunez-Aguirre, who was driving, nor Defendant, possessed a valid drivers' license. [*Id.*] Nunez-Aguirre consented to a vehicle search, during which the officers discovered under the rear seat of the vehicle $30,000 in United States currency, heavily compressed in two stacks of clear plastic, in $100 and $50 denominations. [DE-18, Exs. 1, 2].

Upon discovery of the currency, Lieutenant Worthington telephoned SA Swivel at his office in Wilmington to inform him of the circumstances surrounding the vehicle stop and to request his assistance in confirming the identity and immigration status of both Defendant and Nunez-Aguirre. [DE-18, Ex. 2]. Through records checks of immigration databases, SA Swivel determined that Nunez-Aguirre had been previously deported. [*Id.*]. He could not ascertain Defendant's status, however. SA Swivel asked Lieutenant Worthington to hold Nunez-Aguirre for immigration processing, and "indicated . . . that he wanted to identify and speak with [Defendant] as well." [*Id.*]. SA Swivel asked the officers to detain both men until he could drive from his office in Wilmington to the trailer in Nakina and interview them. The officers detained Nunez-Aguirre and Defendant accordingly. SA Swivel testified he spoke with Lieutenant Worthington until approximately 4:20 or 4:30 p.m., then immediately responded. According to evidence submitted by the Government, the trip from Wilmington to 519 Old Baggett Road in

Nakina is approximately ninety miles with no direct route from one point to the other. [DE-23, Ex. 1].

SA Swivel arrived at the trailer at 519 Old Baggett Road at approximately 6:45 p.m. and interviewed Defendant in Spanish. [DE-18, Ex. 2]. Defendant stated he was in the country illegally and had twice been deported. [*Id.*]. Based on the biographical information provided by Defendant, SA Swivel verified that Defendant had been previously deported. [*Id.*]. Defendant told SA Swivel he had only lived at the residence for a week or two and did not know to whom the currency found in the Jeep Cherokee belonged. [*Id.*]. SA Swivel then asked Defendant for consent to search the trailer and read the consent form to him in Spanish. [*Id.*]. Defendant assented to the search and signed the consent to search at approximately 8:30 p.m. [*Id.*]. When SA Swivel asked Defendant whether there were any narcotics, contraband, currency, or firearms in the trailer, Defendant informed him there was a firearm underneath some clothing in a laundry basket that belonged to him. [*Id.*]. When officers searched the residence, they found a Smith and Wesson .22 caliber handgun, which they determined was stolen. Officers also found a fraudulent Permanent Resident Card and Social Security Card in Defendant's name. Detective Norris then arrested Defendant for possession of a stolen firearm. [*Id.*].

Following his arrest, the officers transported Defendant to the Columbus County Sheriff's Office. [DE-18, Ex. 3]. SA Swivel informed Defendant of his *Miranda* rights in Spanish using a pre-printed form. [*Id.*]. Defendant stated he understood his rights, waived his right to counsel, and agreed to speak to the officers. [*Id.*]. Defendant again informed SA Swivel he was in the country illegally, having been twice deported. Defendant explained that he kept the handgun found in his residence for his protection, and that he did not know it was illegal for him to possess a firearm. He denied any knowledge of the $30,000 found in the Jeep Cherokee. [*Id.*].

Defendant has now been charged with illegal reentry into the United States after being deported in violation of 8 U.S.C. § 1326, and being an illegal alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5) and 924. [DE-1]. Defendant asks this Court to suppress evidence seized as a result of the search of his residence and the information given by Defendant during the custodial interrogation that followed.

**Legal Background**

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. amend. IV; *see also* Terry v. Ohio, 392 U.S. 1, 30-31 (1968) (holding that a brief investigatory stop of an individual must be supported by reasonable suspicion). The "[t]emporary detention of individuals during the stop of an automobile by the police . . . constitutes a 'seizure,'" no matter how brief the detention or how limited its purpose. Whren v. United States, 517 U.S. 806, 809 (1996) (quoting U.S. Const. amend IV). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810. Like the driver, a passenger in a vehicle stopped by the police is seized by the stop within the meaning of the Fourth Amendment and has standing to challenge the constitutionality of the detention. Brendlin v. California, 551 U.S. 249, 251 (2007); United States v. Soriano-Jarquin, 492 F.3d 495, 499-500 (4th Cir. 2007), *cert. denied*, 552 U.S. 1189 (2008).

Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). Pursuant to such a stop, a police officer may lawfully "request a driver's license and vehicle registration, run a computer check, and issue a citation." *Id.* "Any further investigative detention, however, is beyond the

5

scope of the *Terry* stop and, therefore, illegal *unless* the officer has a reasonable suspicion of other criminal activity or the individual consents to the further detention." *Id.* (emphasis added).

The question of whether reasonable suspicion exists is one "not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." *Id.* at 781 (citing Ornelas v. United States, 517 U.S. 690, 695-96 (1996)); *see also* Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (stating that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior"). Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Wardlow, 528 U.S. at 123. To show reasonable suspicion, an officer must articulate specific facts evincing more than an "inchoate and unparticularized suspicion or hunch" of criminal activity. Terry, 392 U.S. at 27.

A court's review of the specific facts and accompanying inferences articulated by an officer to show reasonable suspicion "must be holistic." United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008), *cert. denied*, 129 S. Ct. 943 (2009). That is, the reviewing court must look at the totality of the circumstances "and not find a stop unjustified based merely on a 'piecemeal refutation of each individual' fact and inference." *Id.* (quoting United States v. Whitehead, 849 F.2d 849, 858 (4th Cir. 1988)). "It is the entire mosaic that counts, not single tiles." Whitehead, 849 F.2d at 858. Moreover, the decision by an officer to detain an individual must be evaluated objectively. *See, e.g.*, Wardlow, 528 U.S. at 123; Terry, 392 U.S. at 21-22. An officer's subjective state of mind is irrelevant to the inquiry. *See* Branch, 537 F.3d at 337. "[I]f sufficient

6

objective evidence exists to demonstrate reasonable suspicion, a *Terry* stop is justified regardless of a police officer's subjective intent." *Id.*

The Fourth Circuit has summarized the appropriate inquiry into an alleged unlawful detention following a traffic stop as follows:

> If a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and determine that the driver is entitled to operate his vehicle. The driver's consent or reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes. In order to demonstrate reasonable suspicion, a police officer must offer "specific and articulable facts" that demonstrate at least "a minimal level of objective justification" for the belief that criminal activity is afoot. Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement.

*Id.* at 337 (citations omitted).

The length of time allowed for an investigative stop depends on the facts and circumstances of each case, including "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." United States v. Sharpe, 470 U.S. 675, 686 (1985). As the Supreme Court stated in Sharpe:

> [O]ur cases impose no rigid time limitation on *Terry* stops. While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

*Id.* at 685 (citations omitted). With this guidance in mind, the undersigned considers the arguments presented by the parties with regard to the specific facts of the instant case.

**Analysis**

Defendant concedes that the "knock and talk" conducted by the officers at the trailer, as well as the traffic stop itself, were constitutional. He further admits that the initial period of detention following discovery of the $30,000 in the vehicle was lawful. Defendant argues, however, that his continued detention from 4:00 p.m., when the officers contacted SA Swivel, until 6:45 p.m., when SA Swivel arrived, exceeded the bounds of a constitutional stop and was therefore unlawful. The prolonged detention, asserts Defendant, irreparably tainted the events following the detention and rendered void his consent to search his residence, as well as his agreement to waive his *Miranda* rights and speak to SA Swivel without the benefit of counsel. According to Defendant, the firearm seized during the search of the trailer and the statements made during his custodial interrogation must therefore be suppressed as "fruit of the poisonous tree."

The evidence shows, however, that the officers reasonably suspected that Defendant was an illegal alien involved in drug trafficking, and that they acted diligently in pursuing their investigation in an attempt to either confirm or dispel their legitimate suspicions. Defendant informed Detective Worley during the initial knock and talk that he was in the country illegally and presented a Mexican voter registration card as his only identification. The officers could therefore reasonably suspect that Defendant was violating the Immigration and Nationality Act. *See* United States v. Guijon-Ortiz, No. 2:09-00131, 2009 U.S. Dist. LEXIS 110505, at *14-15 (S.D.W.Va. Nov. 25, 2009) (concluding that, where the defendant's Permanent Resident Card contained irregularities and the defendant admitted to his illegal status, a sheriff's department law enforcement officer possessed probable cause to believe the defendant was violating the Immigration and Nationality Act; the officer was therefore authorized to place the defendant

8

under arrest). Because the officers reasonably suspected Defendant was an illegal alien, they were authorized to detain him until they could confirm his status. The officers diligently pursued their investigation by immediately contacting SA Swivel, who drove from his office in Wilmington directly to the site in Nakina to personally interview Defendant and either confirm or dispel the officers' legitimate suspicions.

Defendant contends, however, the officers had no authority to detain him on suspicion of being an illegal alien because the officers were not federal actors and could not enforce federal immigration law. Assuming without deciding the officers had no authority to *arrest* Defendant on immigration charges, there is nothing in the statutes or case law cited by Defendant to suggest state officers have no authority to temporarily *detain* persons reasonably suspected of federal law violations. Federal and state law enforcement officials often work together on investigations; indeed, the Columbus County Sheriff's Department first learned of the possible drug trafficking at 519 Old Baggett Road through information passed along by SA Swivel, a federal agent. Defendant directly informed Detective Worley of his illegal status. Lieutenant Worthington in turn informed SA Swivel of Defendant's potential immigration violation. SA Swivel requested that Defendant be detained until he could personally interview him. Under the circumstances, it was entirely reasonable for the officers to temporarily detain Defendant until SA Swivel could arrive to confirm his illegal status.

The officers also had reasonable grounds to suspect Defendant was involved in drug trafficking. SA Swivel had passed along information from a cooperating federal defendant that the trailer at 519 Old Baggett Road was a stash house for "large amounts of cocaine." Defendant told officers he resided at the trailer in question. Shortly after conducting the "knock and talk" with Defendant, the officers observed Defendant and Nunez-Aguirre driving away from the

residence, although neither man possessed a valid drivers' license. After receiving consent to search the Jeep Cherokee, the officers discovered $30,000 in United States currency hidden under the rear seat of the vehicle, packaged in a manner consistent with the smuggling of drug proceeds. Neither Nunez-Aguirre nor Defendant offered any explanation for the money. At that point, the officers' suspicions understandably escalated. Although Defendant notes there is "nothing unlawful, in itself, [in] possessing United States currency" [DE-18, p.11], the court must consider each fact in view of the totality of the circumstances, not piecemeal refutations of individual circumstances. Branch, 537 F.3d at 337. Courts have found that carrying large, unexplained amounts of cash can create reasonable suspicion. *See, e.g.*, United States v. Chhien, 266 F.3d 1, 8-9 (1st Cir. 2001) (concluding that discovery of $2,000 in cash during a traffic stop supported a determination of reasonable suspicion and justified a brief period of further detention), *cert. denied*, 534 U.S. 1150 (2002); Conrod v. Davis, 120 F.3d 92, 97 (8th Cir. 1997) (concluding that discovery of $6,000 cash in a suspect's pocket and $4,000 in his suitcase furnished reasonable suspicion), *cert. denied*, 523 U.S. 1081 (1998). Discovery of the $30,000 clearly supplied the officers with reasonable grounds to prolong the detention.

As it is evident that reasonable suspicion existed for the officers to detain Defendant following the traffic stop, the question becomes whether or not the detention was too long in duration to be justified as an investigative stop. "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." Branch, 537 F.3d at 336. Notably, the court must consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Sharpe, 470 U.S. at 686.

Here, there is no evidence to show the officers failed to diligently pursue their investigation. Following Defendant's admission of his illegal status and the discovery of the $30,000 hidden in the vehicle, the officers contacted SA Swivel to determine Defendant's immigration status. SA Swivel was not able to make a determination of Defendant's status over the telephone and told the officers to hold Defendant until he could arrive on the scene. SA Swivel immediately left his office in Wilmington and drove to Nakina. Because of the rural location in which the stop took place, the distance from Wilmington, and the inability of SA Swivel to make a definitive determination via telephone as to Defendant's immigration status, the duration of the detention, while somewhat lengthy, was no longer than necessary under the circumstances, given its purpose. Branch, 537 F.3d at 336.

Defendant argues that, as he was detained in close proximity to his residence, the officers should have allowed him to return to his home and await SA Swivel's arrival there. Defendant also asserts the officers had no reason to handcuff him. These contentions ignore the commonsense reality faced by the officers, who reasonably suspected Defendant of drug trafficking. The close interrelationship between drug trafficking and weapons is all too well known. Detective Worley testified they handcuffed Defendant "[f]or officer's safety while we were waiting for Immigration Agent Tom Swivel to . . . arrive." [DE-35, p. 10]. The Supreme Court has emphasized that "the safety of the officer" during a traffic stop is a "legitimate and weighty interest." Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977). As a general rule, officers conducting a *Terry* stop are authorized to "take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). The Fourth Circuit has recognized that drawing weapons, handcuffing a suspect, or placing a suspect in a patrol car for questioning does not

11

Case 7:10-cr-00069-FL   Document 44   Filed 11/15/10   Page 11 of 12

necessarily elevate a lawful detention into a custodial arrest for *Miranda* purposes. United States v. Moore, 817 F.2d 1105, 1108 (4th Cir.), *cert. denied*, 484 U.S. 965 (1987). It is unreasonable to suggest, as Defendant does, that the officers had nothing to fear from his being allowed to return to his residence. The officers at that point had no knowledge as to the possible presence of firearms or other weapons in Defendant's residence. Defendant in fact kept a handgun in the trailer. Had the officers allowed Defendant to leave, he could have easily returned with his handgun. Because officer safety was a legitimate concern, the officers acted lawfully in their restraint of Defendant.

**Conclusion**

The evidence shows that the officers in the instant case reasonably suspected Defendant of being an illegal alien involved in drug trafficking and that they diligently pursued their investigation in order to confirm or dispel their suspicions as quickly as practicable under the circumstances. The duration of the resulting detention was no longer than necessary, given its purpose. Because the detention was lawful, it did not taint Defendant's consent to search his residence or his decision to waive his right to counsel and speak to investigators during his custodial interrogation. As Defendant has failed to show his detention violated constitutional precepts, the undersigned recommends that Defendant's Motion to Suppress be DENIED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Monday, November 15, 2010.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE