IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:10-CR-00069-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | ORDER |
| ESTEBAN NUNEZ-BETANCOURT, ) | |
| ) | |
| Defendant. ) | |

This matter comes before the court on defendant's motion to suppress (DE #18), to which the government has responded and to which response defendant has filed a reply. Pursuant to 28 U.S.C. § 636(b)(1), United States Magistrate Judge William A. Webb entered a memorandum and recommendation ("M&R") wherein he recommended that the court deny defendant's motion to suppress. Defendant timely filed an objection to the M&R, and the government responded. In this posture, the issues raised are ripe for ruling. For the reasons that follow, defendant's motion to suppress is denied.

## STATEMENT OF THE CASE

Defendant was originally charged in a two-count indictment returned by the grand jury on June 16, 2010. In the superceding indictment, dated August 26, 2010, the grand jury charged defendant on three counts: (1) conspiracy to distribute and possession with intent to distribute five hundred (500) grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) illegal reentry of an alien having been previously deported in violation of 8 U.S.C. § 1326; and (3) being an illegal alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5) and 924.

On August 20, 2010, defendant filed the instant motion to suppress, seeking to exclude certain physical and testimonial evidence. The government filed a response in opposition on September 3, 2010, to which defendant replied on September 13, 2010. Pursuant to 28 U.S.C. § 636(b)(1), the matter was referred to the magistrate judge. On October 1, 2010, the parties appeared before the magistrate judge for an evidentiary hearing. The magistrate judge issued his M&R on November 15, 2010, wherein it was recommended that defendant's motion to suppress be denied. Defendant filed an objection to the M&R on November 26, 2010, to which the government responded on December 9, 2010.

On December 30, 2010, the court on its own initiative, in giving its attention to the significant issues raised by defendant's motion to suppress but noting defendant's heavy reliance on out of circuit precedent, suggested that defendant file a supplemental memorandum supported by Fourth Circuit precedent. Defendant's supplemental memorandum was filed on January 12, 2011. The government was given until January 24, 2011, to file a response, but did not do so.

On December 7, 2010, defendant filed a motion for discovery (DE #48). Defendant's arraignment is currently set for February 15, 2011, before the undersigned.

## STATEMENT OF FACTS

The investigation leading to defendant's arrest originated with a confidential tip. In February 2010, Special Agent Thomas Swivel ("Agent Swivel") of Immigration and Customs Enforcement ("ICE") interviewed a cooperating federal defendant in South Carolina regarding possible drug activity at a trailer located at 519 Old Baggett Road in Nakina, Columbus County, North Carolina. (Def.'s Ex. 7) The cooperating defendant stated that the trailer was used by Hispanic drug dealers as a prostitution house as well as a stash house and distribution point of "large amounts" of cocaine.

2

(Id.) Soon thereafter, the Columbus County Sheriff's Office began conducting surveillance on the property. (Id.)

On March 1, 2010, at approximately 3:00 p.m., Detective Kevin Norris ("Detective Norris"), Detective Justin Worley ("Detective Worley"), and Lieutenant Steven Worthington ("Lieutenant Worthington"), all of the Columbus County Sheriff's office, drove to the property to conduct surveillance and observed two vehicles, a Nissan Sentra and a Jeep Cherokee, parked in the driveway. (Def.'s Ex. 2) Although the officers had conducted surveillance between ten and twenty times on the property, this was the first time they had observed any cars there. (Id.)

Detectives Worley and Norris approached the trailer and knocked on the door, while Lieutenant Worthington remained in the service vehicle. (Mot. to Supp. Hr'g Tr. p. 9-10) Defendant answered the door. (Tr. p. 15) Defendant informed the officers that he resided at the trailer. (Def.'s Ex. 2) The officers explained that they had reason to believe narcotics were being stored at the residence and requested consent to search. (Def.'s Ex. 1) Defendant refused consent to search the residence. (Id.) The officers asked if anyone else was inside the residence, and defendant informed them that his friend Norberto Nunez-Aguirre ("Nunez-Aguirre") was inside. (Id.) Asked if they had valid identification, both defendant and Nunez-Aguirre provided Mexican identifications, North Carolina identifications, and Florida identifications (Id.) The officers determined that neither man had valid driver's licenses. (Id.) Defendant also informed officers that he was in the United States illegally. (Tr. p. 19-20)

Thereafter, at approximately 3:20 p.m., the officers left the residence but maintained surveillance of the residence from a concealed location. (Def.'s Ex. 1) Approximately ten minutes later, at 3:30 p.m., the officers saw the Jeep Cherokee with two male occupants leaving the

3

residence. (Id.)

Based on their knowledge that neither of the two men at the residence had a valid driver's license, the officers conducted a traffic stop at 3:31 p.m. (Id.) The officers verified that the two men in the vehicle were the same men from the residence, and further determined that the driver, Nunez-Aguirre, had no driver's license. (Id.) Nunez-Aguirre consented to a search of the vehicle, during which search the officers discovered $30,000.00 in United States currency, in $100.00 and $50.00 denominations, wrapped in clear plastic and hidden under the rear seat of the vehicle. (Def.'s Ex. 2). Both defendant and Nunez-Aguirre were handcuffed, but were told they were not under arrest. (Resp. in Opp'n, p. 5)

At approximately 4:00 p.m., the officers contacted Agent Swivel to inform him of the traffic stop and to request immigration checks for the subjects. (Def.'s Ex. 2) Agent Swivel was able to determine over the telephone that Nunez-Aguirre was a previously deported alien, but was unable to determine defendant's immigration status over the telephone. (Id.) Accordingly, Agent Swivel requested that the officers continue to detain defendant until Agent Swivel could arrive on the scene, so Agent Swivel could personally interview defendant. (Id.) Agent Swivel testified that he spoke with the officers on the telephone until approximately 4:30 p.m., and then immediately left his office in Wilmington. (Tr. p. 26) He arrived at the scene at approximately 6:45 p.m. (Id.) The government has submitted evidence showing that the trip from Wilmington to the residence at 519 Old Baggett Road in Nakina is approximately ninety (90) miles with no direct route. (Resp. in Opp'n, Ex. 1)

Shortly after Agent Swivel arrived on the scene, he interviewed defendant in Spanish, without advising defendant of his Miranda rights. (Def.'s Ex. 2) During the interview, defendant informed Agent Swivel that he was in the United States illegally and that he had twice been

4

deported. (Id.) Based on the biographical information provided by defendant, Agent Swivel was able to confirm that defendant had been previously deported. (Id.)

Defendant further informed Agent Swivel that he had only lived at the residence for a week or two, and that he did not know to whom the currency in the vehicle belonged. (Id.) Agent Swivel asked defendant's consent to search the residence but also informed defendant that he did not have to consent; however, defendant gave consent to search the residence. (Id.) Agent Swivel then read the consent form to defendant in Spanish, and again explained that he had the right to refuse consent. (Id.) Again, defendant consented to the search, and signed the consent form at approximately 8:30 p.m. (Id.; Def.'s Ex. 5) When Agent Swivel asked defendant if there were any narcotics, contraband, currency, or firearms in the residence, defendant stated that detectives would find a firearm belonging to defendant hidden beneath some clothing in a laundry basket. (Def.'s Ex. 2)

At 8:40 p.m., officers conducted a search of the residence and discovered a Smith and Wesson .22 caliber handgun, which was determined to have been stolen after officers conducted a record check of the serial number. (Id.) Additionally, officers discovered a fraudulent Permanent Resident Card and a Social Security Card bearing defendant's name. (Id.) Officers completed the search of the residence at approximately 9:10 p.m., and at that time arrested defendant for possession of a stolen firearm. (Id.)

After defendant was arrested, he was transported to the Columbus County Sheriff's Office. (Id.) At some point after arriving there, defendant was advised of his Miranda rights in Spanish using a pre-printed form, after which defendant waived his right to counsel and agreed to speak to the officers, although there is a discrepancy as to exactly when this occurred. The ICE investigation report states that the interview began at approximately 9:10 p.m., and suggests that defendant signed

5

the waiver form before the interview began. (Def.'s Ex. 3) The consent form itself states that defendant signed the document at 10:07 p.m. (Def.'s Ex. 4) After waiving his rights and agreeing to be interviewed, defendant was interrogated by Agent Swivel. (Def.'s Ex. 3)

During the course of the interrogation, defendant informed Agent Swivel that he was in the United States illegally and that he had twice been deported. (Id.) Defendant stated that a friend had given him the firearm, that he had been in possession of it for approximately two months, and that he did not know it was illegal for him to possess it. (Id.) Defendant stated that he did not know to whom the money in the car belonged. (Id.) Agent Swivel terminated the interview at approximately 10:45 p.m. (Id.)

Defendant is now charged in a three-count indictment with: (1) conspiracy to distribute and possession with intent to distribute five hundred grams or more of a mixture and substance containing a detectable amount of methamphetamine; (2) possession of a firearm by an alien illegally and unlawfully in the United States; and (3) illegal reentry. Defendant has moved to suppress the physical evidence gained during the search of the residence as well as statements he gave during the interrogations.

## DISCUSSION

A.  Standard of Review

These issues are before the court with benefit of the magistrate judge's thoughtful analysis. The district court reviews *de novo* those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a *de novo* review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th

Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c).

B.  Analysis

To aid the analysis of the issues at hand, it is helpful to identify the separate occurrences of March 1, 2010, which trigger constitutional inquiry. First, at 3:00 p.m., county law enforcement officers conducted a "knock and talk" at the trailer. Then, at 3:30 p.m., the same officers conducted a traffic stop of the car in which defendant was a passenger, after witnessing the driver commit a traffic violation. Shortly thereafter, defendant was placed in handcuffs and was detained at the request of Agent Swivel. At approximately 6:45 p.m., Agent Swivel arrived and some time thereafter interviewed defendant without giving him Miranda warnings, during which interview defendant made statements regarding his immigration status and his possession of a firearm, and gave consent to search his residence. At 8:40 p.m., officers conducted a search of defendant's residence pursuant to defendant's consent, during which search the firearm was discovered. At 9:10 p.m., defendant was formally arrested and transported to the sheriff's office where officers advised defendant of his Miranda rights, obtained a waiver of those rights, and interviewed defendant again.

Defendant moves to suppress all evidence seized by law enforcement during the search of defendant's residence, as well as statements made by defendant during interrogations with law enforcement. In support of his motion to suppress, defendant argues that his detention following the traffic stop was unlawful in that it exceeded the permissible scope of an investigative detention under

7

Terry v. Ohio, 392 U.S. 1 (1968). Defendant further argues that he was "in custody" for purposes of Miranda when he was first interviewed by Agent Swivel, and therefore that the failure to properly advise defendant of his Miranda rights prior to the interview amounted to a constitutional violation. Accordingly, defendant argues that the consent given to search his trailer was tainted by his illegal arrest and interrogation.

In response, the government argues that defendant's detention following the traffic stop was a lawful investigative detention supported by reasonable suspicion under Terry. Accordingly, the government argues that Miranda warnings were not required prior to the first interview with Agent Swivel, and therefore that defendant's consent to search the trailer was valid.

The magistrate judge reasoned that defendant's detention following the traffic stop was a valid investigative detention under Terry conducted pursuant to reasonable suspicion. On these grounds, the magistrate judge concluded that Miranda warnings were not required and that defendant's consent to search his residence was valid. The magistrate judge accordingly recommended that defendant's motion to suppress be denied.

Defendant objected to the M&R on several grounds. First, defendant argues that the detention following the traffic stop was not lawful because it was not supported by reasonable suspicion. Second, defendant argues that the sheriff's officers had no authority to detain defendant pending investigation of suspected federal immigration violations. Third, defendant argues that the officers did not have reasonable suspicion that defendant was involved in drug trafficking. Fourth, defendant argues that the detention following the traffic stop was not lawful because it was too long in duration and also because the manner of the detention was too invasive. Lastly, defendant argues that the detention was transformed into a full custodial arrest by the length and manner of the

8

detention. The court reviews *de novo* those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b).

It is worthwhile to first mention that defendant lodges no challenge to the legality of the "knock and talk" encounter at defendant's trailer, as he acknowledges that brief, consensual and non-coercive interactions with law enforcement do not trigger the Fourth Amendment. See Florida v. Bostick, 501 U.S. 429, 434 (1991) (noting that an "encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature"). Defendant concedes as well that the traffic stop itself was lawful. A temporary detention of individuals during a traffic stop does constitute a seizure for Fourth Amendment purposes, no matter how brief the detention or how limited its purpose. Whren v. United States, 517 U.S. 806, 809 (1996). However, an officer's observation of a traffic violation constitutes sufficient justification for a police officer to detain the vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). Because the officers in this case knew that neither man in the car had a valid driver's license, the officers were justified in conducting the traffic stop.

The constitutional issues begin, according to defendant, with the defendant's detention following the traffic stop. Around 3:40 p.m., officers conducted a consent search of the vehicle and discovered the hidden $30,000.00 in United States currency. At that time, defendant was placed in handcuffs. Officers contacted Agent Swivel to inform him of the incident and to request immigration status reports on both defendant and Nunez-Aguirre. Because Agent Swivel was unable to confirm defendant's immigration status over the telephone, Agent Swivel requested that officers continue to detain defendant until he could arrive from Wilmington, which was approximately ninety (90) miles away and with no direct route. Agent Swivel began the trip shortly after hanging up the

9

telephone around 4:30 p.m., and arrived on the scene around 6:45 p.m., interviewing defendant shortly after his arrival.

Defendant argues that his detention after the traffic stop was unlawful because it was not supported by reasonable suspicion. It is well-established that during a routine traffic stop, such as the one here, an officer may briefly detain the driver and passengers in order to perform the traditional incidents of a routine traffic stop, such as request a driver's license and vehicle registration, run a computer check, and issue a citation. Foreman, 369 F.3d at 781. "Any further investigative detention, however, is beyond the scope of the Terry stop and, therefore, illegal unless the officer has a reasonable suspicion of other criminal activity or the individual consents to the further detention." Id. Defendant's detention beyond the routine traffic stop, therefore, is justifiable only if supported by reasonable suspicion of other criminal activity.

The Supreme Court's holding in Terry explains that reasonable suspicion exists where a police officer has a reasonable belief that criminal activity is afoot. Terry, 392 U.S. at 30. The Supreme Court has since explained that the reasonable suspicion standard is not precisely articulable, but rather is a "commonsense, nontechnical conception" that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. U.S., 517 U.S. 690, 695 (1996). Accordingly, the reasonable suspicion standard is not readily "reduced to a neat set of legal rules," but is simply a "particularized and objective basis for suspecting the person stopped of criminal activity." Id. at 695-96. Whether reasonable suspicion existed is to be determined based on the events which occurred leading up to the stop, and then the decision whether those historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion. Id. at 696.

The defendant's prolonged detention was properly supported by reasonable suspicion on two separate grounds. First, the officers had reasonable suspicion that defendant was involved in drug trafficking. The officers were investigating on a confidential tip that the trailer on Old Baggett Road was being used as a stash house by Hispanic drug dealers. During the "knock and talk" at the trailer, officers learned that defendant lived in the trailer. Shortly after conducting the "knock and talk" and questioning defendant about illegal drugs, the officers observed defendant and Nunez-Aguirre driving away although neither had a valid driver's license. Finally, during a consent search of the vehicle, officers discovered $30,000.00 in United States currency hidden under the back seat, which was packaged in a manner consistent with the smuggling of drug proceeds. These facts and the inferences drawn from them, taken together, certainly created reasonable suspicion that defendant was involved in drug trafficking. See U.S. v. Branch, 537 F.3d 328, 337 (4th Cir. 2008) (explaining that reasonable suspicion exists where factors, taken together, could produce a reasonable suspicion of criminal activity). Secondly, the officers certainly had reasonable suspicion that defendant was an illegal alien, inasmuch as defendant told the officers he was in the United States illegally, produced only Mexican identification cards, and did not have a valid driver's license. Because the officers had reasonable suspicion that defendant was involved in drug trafficking and that he was an illegal alien, the investigative detention of defendant following the traffic stop is valid.

Defendant next argues that the investigative detention, which lasted for several hours and during which time defendant was held in handcuffs, was too lengthy to be justified as an investigative detention under Terry. In some cases, a detention which was lawful at its inception may become unconstitutional by virtue of its duration, such that "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." U.S. v. Sharpe, 470

U.S. 675, 685 (1985). The Supreme Court, however, has repeatedly declined to establish a bright-line rule for determining the appropriate length of a detention. See Id. at 685-86 (explaining that "common sense and ordinary human experience must govern over rigid criteria"). Rather, in determining whether a detention is too long in duration to be justified as an investigative stop, the appropriate question is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. at 686. A court making this assessment should consider whether the police are acting in a swiftly developing situation, and should balance the law enforcement objectives against the invasion of defendant's Fourth Amendment interests. Id. The question is whether the detention lasted longer than was necessary, given its purpose. Branch, 537 F.3d at 336 (4th Cir. 2008) (citing Florida v. Royer, 460 U.S. 491, 500 (1983)).

Defendant's detention, although somewhat lengthy, was not too long in duration to be justified as an investigative stop when considering the surrounding circumstances. Officers had reasonable suspicion that defendant was in the United States illegally. After Agent Swivel was unsuccessful in determining defendant's immigration status over the telephone, officers agreed to detain defendant until Agent Swivel could arrive. Agent Swivel departed almost immediately, and interviewed defendant shortly after arriving on scene. It was necessary for officers to detain defendant in the meantime in order to preserve the status quo until defendant's immigration status could be confirmed. The officers were diligent and not dilatory in pursuing this means of investigation, which was likely to, and in fact did, confirm their suspicions quickly. Obvious exigencies, including Agent Swivel's need to personally interview defendant in order to correctly identify him, as well as the distance Agent Swivel had to travel to conduct the interview, necessitated

a longer period of detention to determine defendant's immigration status. See U.S. v. Diaz-Quintana, 596 F.Supp.2d 1273, 1280 (D.N.D. 2009) (finding that twenty-four (24) hour detention pending investigation of defendant's immigration status was lawful where exigencies required a longer period of detention). The detention is therefore properly justified as an investigative detention under Terry.

Defendant next argues that the length of the detention coupled with the use of handcuffs rendered the seizure so intrusive that it was transformed into a full custodial arrest which was unsupported by probable cause and therefore unlawful. Detective Worley testified that after the hidden currency was discovered in the vehicle, defendant was handcuffed "for officer's safety." (Tr. Detention Hr'g, at 9-10). The officers had reasonable suspicion that defendant was involved in drug trafficking. The Fourth Circuit has recognized that reasonable police officers recognize "the close relationship between drugs and guns and the possible danger inherent in a drug transaction." U.S. v. Davis, 383 Fed.Appx. 269, 273 (4th Cir. 2010). Furthermore, the Supreme Court has emphasized that the safety of law enforcement officers is a weighty interest, and has explained that officers conducting a Terry stop are authorized to "take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." U.S. v. Hensley, 469 U.S. 221, 235 (1985). The officers were justified in handcuffing defendant for their own safety while waiting for Agent Swivel to arrive.

Not only was the use of handcuffs justified, but the use of handcuffs is not sufficient to transform the Terry stop into a custodial arrest requiring probable cause. The Fourth Circuit has held that it is not the degree of restriction of an individual's liberty that transforms a Terry stop into a custodial arrest, but rather the duration of the stop. See Davis, 383 Fed.Appx. at 274. Indeed, a

13

"brief but complete restriction of liberty is valid under Terry." U.S. v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995). For those reasons, officers' actions to restrain a suspect, including "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force," are not sufficient to transform a Terry stop into a custodial arrest. Davis, 383 Fed.Appx. at 274. Because, as already explained, defendant was detained for no longer than necessary to complete the purposes of the stop, the complete restriction of defendant's liberty during that period does not elevate the detention to a custodial arrest.

Defendant's final argument against the legitimacy of the detention involves an attack on the Columbus County Sheriff's officers' authority to temporarily detain defendant on suspicion of violating federal immigration laws. Defendant argues that "the [d]etectives were without authority to detain persons for immigration enforcement." (Def.'s Mot. to Supp., 13).

Generally, federal agents are authorized to interrogate or arrest persons believed to be violating immigration laws. See 8 U.S.C. § 1357(a). Under certain circumstances, state and local law enforcement officers may become authorized to perform immigration officer functions. See 8 U.S.C. § 1357(g)(1). This program, popularly known as the 287(g) program, permits the deputizing of local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement. Id.; see also U.S. v. Sosa-Carabantes, 561 F.3d 256, 257 (4th Cir. 2009). Defendant argues that because there was no such agreement in this case, the local officers had no authority to simply detain defendant at the request of Agent Swivel. Defendant's argument is without merit, as § 1357 itself recognizes that an agreement is not required for local law enforcement officers to cooperate with federal authorities "in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10); see also Santos v. Frederick

14

County Board of Commissioners, 2010 WL 3385463, *3, n. 9 (D.Md. 2010) (observing that officers not participating in the 287(g) program are still permitted to assist in the enforcement of federal immigration laws). The court is explicitly not determining whether the officers had the authority to interrogate or arrest defendant, as that issue is not before the court. Rather, the court merely concludes that the officers' temporary investigative detention at the request of Agent Swivel was not unwarranted.

For the reasons enumerated above, the investigative detention of defendant pending confirmation of his immigration status was constitutionally valid. Accordingly, Miranda warnings were not required prior to defendant's first interview with Agent Swivel. It is well-recognized that Miranda warnings are not required when a suspect is not in custody, but rather temporarily detained under Terry. See U.S. v. Sullivan, 138 F.3d 126, 130 (4th Cir. 1998). Further, the Fourth Circuit has recognized that restrictions on liberty such as the use of handcuffs, placing a suspect in a patrol car, and drawing weapons, do not necessarily amount to a custodial arrest for Miranda purposes. U.S. v. Leshuk, 65 F.3d 1105, 1109-10 (1995). Because defendant was merely temporarily detained pursuant to a lawful Terry stop, Miranda warnings were not required. It follows that defendant's consent to search his residence was not tainted by an unlawful detention or questioning.

For the foregoing reasons, defendant's objections to the M&R are overruled, and defendant's motion to suppress is denied.

## CONCLUSION

Upon *de novo* review of those portions of the magistrate judge's M&R to which specific objections have been filed, and upon considered review of those portions of the M&R to which no such objection has been made, the court concludes that defendant's objections to the M&R shall be

15

overruled. Defendant's motion to suppress (DE #18) is accordingly DENIED.

SO ORDERED, this the 3rd day of February, 2011.

LOUISE W. FLANAGAN
Chief United States District Judge